By the Court,
Hitchcock, Judge.
In deciding this ease, in the view we take of it, it will be unnecessary to determine whether the-state of Connecticut had jurisdiction over the Connecticut Western Reserve, prior to the act of cession of 1800, or not. This question does not appear to have been agitated upon t-he circuit, but for the-purposes of this case the jurisdiction seems to have heen admitted.
The court charged the jury that the administrator’s deed conveyed, nothing to the grantee, because the intestate had no interest in the land.
Whether the opinion of the court thus expressed was in conformity with law, must depend upon the construction of the grant of the state-of Connecticut. This grant was made by the legislature of that state, by resolution bearing date May 10th, 1792. Swan’s L. Laws, 81. To-its proper understanding it is necessary to take the preamble in connection with the resolution, and it maybe useful to quote both the preamble and resolution. It is as follows : ‘‘ Upon the memorial of the towns of Fairfield and Norwalk, showing to this assembly, that many of the inhabitants of said towns suffered great losses by the devastations of the enemy, during the late war, praying a compensation therefor ; and in a report of a committee appointed by this assembly, at. their sessions held at Hartford, in May, 1791, to ascertain from doeu *172 ments in the public offices, the amount of the losses of the said •memorialists, and others, under similar circumstances, which have been estimated conformably to acts of this legislature, being such as were ■ occasioned by the incursions of the enemy during the late war, distinguishing the losses of buildings and necessary furniture, from those of other articles, by said documents or otherwise ; and also, to ascertain the advancements which have been made to the sufferers, by ■abatement of taxes or otherwise ; and report the same, with their opinion relative to the ways and means of affording further relief, as per memorial and report on file. ■
“ Resolved by this assembly, that there hereby is, released and quit claimed to the sufferers hereafter( named, or their legal representatives, where they are dead, and to their heirs and assigns forev'er, five hundred thousand acres of the lands belonging to this state, lying * west of the state of Pennsylvania,-and bounding northerly on the shores of Lake Erie, beginning at the west line of said land, and -extending eastward, to a line running northerly and southerly, parallel to the east line of said tract of land belonging to this state, and extending the whole width of said lands, and easterly so far as to ■make said quantity of five hundred thousand acres of land, exclusive ■of any lands within said bounds, if any be, which may have been heretofore granted, to be divided to and among said’ sufferers, and their legal representatives, where they are dead, in proportion to the ■several sums annexed to their names, as follows in the annexed list.”
Then follows a list of "names, with the amount of loss sustained by •each. In this list, is the name of James Thompson, of New London, ■and the amount of loss annexed to his name is three hundred and fifty pounds and seven pence.
There can be no mistake as to the persons to whom this grant is made. It is the “ sufferers” themselves, where they are living, or to “ their legal representatives, where they are dead.” At the time it was made, James Thompson had been dead some years,-and the grant is as effectually to his heirs as if they had been specifically named therein. It is made to them, not as a matter of right, but as a donation to compensate for losses sustained by their father in the war of •the revolution, from the eo.mmon enemy. And in order to ascertain ■the extent of their interest in the land granted, reference must be had •to the amount of the losses thus sustained.
It is not insisted by the defendant’s counsel, but that the grant of ■■these lands was in fact to the heirs of Thompson, but it is claimed *173 that they took them by descent and not by purchase; and that consequently they were properly liable to the payment of the debts of the.ancestor, from whom they descended, and could he sold for the pay-ment of those debts. The case of the Lessee of Bond v. Swearingen, 1 Ohio, 395, is cited as an authority. That was a case relative to-land within the Virginia military district, and it was decided by the court, that where lands have been located and surveyed by the ancestor, and subsequently patented to his heirs, the heirs* took by descent. By an entry and survey, the lands are appropriated. And when such-survey is made and recorded, every thing has been done that can be by the holder of the wu-rant, to secure to himself a legal title. He has-a perfect equity, and has a claim, noLupon the bounty, but upon the justice of the government, for a patent. And it is right and proper that if the patent is withholden during his life, and * subsequently emanates to his heirs, they should be held as taking by descent. The same principle applies where lands are purchased from the government of the United States, and the purchase money is paid. In-such case the purchaser can, as a ■ matter of right, demand from the ■ government a patent. By the purchase, the land is specifically appropriated, and whether patented or not. an interest in it will descend to* the heirs of the purchaser, in ease of his death.
But the case before the court is entirely different. James Thompson undoubtedly had a claim upon the liberality of the government of ’ Connecticut, if not upon its justice. But how that claim should be satisfied, whether by money, by abatement of taxes, or otherwise, was not determined during his life. There was no specific appropriation* of land for its satisfaction. Whether any satisfaction should be made, and in what way, does not appear to have been fully settled until the.passage of the resolution, by which the grant was made, and that was-long after his death. He never had any interest in these lands whicheou d- descend to his heirs. The grant then was a donation to those - heirs; they took by purchase, and the land granted could not be dispo-ed of to pay the debts of their ancestor. The deed, therefore, of-the administrator of Thompson, did in fact convey nothing, because-Thompson himself had no interest in tho land.
The court next charged tho jury that the deed from the collector of taxes was subject to the same infirmity with the deed from the administrator. Excop ion is taken to this part of the charge.
Ln saying that the collector’s deed is subject to the same infirmity with the administrator’s, I understand the court as meaning that it. *174 -was equally defective to convey title. In order to sustain a title under .a sale for taxes, it is not sufficient to produce the collector’s deed. There must he evidence to show that the tax has been levied, that the steps required by law to authorize a sale have been taken, and that the person making the deed had authority to make it. It must be remembered that the tax for which the interest in this land was sold, was not a tax levied by the state of Ohio, but by a corporation created by the authority of the state of Ohio. Of course we can not resort to ■our public statutes to ascertain whether a tax was or was not levied. Nor can we resort to those statutes as pointing out the mode of collection. The law creating the corporation, is that which is to govern.
The evidence exhibited in this ease to sustain the deed of the collector, was a copy of the records of the fire land company, showing that by an act of the company of the 9th of February, 1804, a tax of * twenty-five cents on the pound of original loss, was assessed by the company, that William Richards was appointed a collector of the company, and that on the 10th of the same month, he was duly .sworn to discharge the duties of his office. This evidence shows that ■ a tax was assessed or levied, and we have no doubt that it was such a tax as the company had a right to assess or levy under its act of incorporation. In the 7th section of the act of incorporation, 1 Swan’s L. L. 107, it is enacted, “ that it shall be the duty of the collector or collectors, to execute all warrants to him or them directed by the treasurer, for collection of any tax or taxes laid by said board of directors. And said collector or collectors, shall give due and reason•able notice of the time when said tax or taxes are or shall be payable to the treasurer of said directors, by advertising the same at least three weeks successively, in at least one newspaper published in each of the counties of Fairfield, New Haven, and New London, in said state of Connecticut, and by giving any further notice in, or without said state of Connecticut, as said directors may order, and that said tax or taxes shall be assessed on the original rights or losses, in pro-portion to each person’s respective share or loss, as set in said grant: Provided, That said lands only shall be subject to the payment of said tax or taxes; and that when any tax or taxes, after the time limited •to the payment thereof, remains unpaid, it shall be the further duty of •said collector or collectors, to give notice of time and place, in manner aforesaid, that he shall proceed to sell, at public vendue, so much of the original loss and right of such delinquent proprietor, as will be ¡sufficient to pay said tax or taxes, and all reasonable charges arising *175 thereon ; said notice to be at least sixty days previous to any sale being made by any collector.” There was no proof before the court, except what is contained in the collector’s deed, that any such notice as is required in this section was ever given. The recital in the deed is not sufficient proof of the fact. It should be proven by evidence extrinsic. To hold a sale for taxes valid, where there is this defect of proof, would be contravening the uniform decisions of this court upon the same subject matter. There being this defect of proof, the court decided correctly that the collector’s deed was not operative to convey title.
It is argued in favor of the motion for a new trial, that as these lands were within the jurisdiction of the state of Connecticut at the time they were sold at administrator’s sale, that the statute of limitations of that state, must, from the time of that sale,' have commenced running in favor of the purchaser, and that by that statute the claim * of the lessors of the plaintiff would be barred. It is a sufficient answer to this position of the counsel to say, that the statute of limitation operates in favor of a person in possession ; that the Indians were in possession of this land until the 4th day of July, 1805, when their title was extinguished by treaty, Swan’s L. L. 482, and that there is no evidence in the case to show that the defendant or those under whom he claims, were ever in-the actual possession until 1809.
Another objection to the verdict is, that it includes too much land. It is insisted by counsel, that if the heirs of James Thompson were not divested of their interest in the lands granted by the state of Connecticut, either by the deed made by the administrator of Thompson, -or by the collector of taxes, they must take the same in common with all the proprietors, regardless of partitions, which have been made ; ■and of course that in the lot of ground which is now in controversy, their proportion, instead of being eight acres, as found by the verdict, would be far less than one-fourth of an acre. This position assumed by counsel can not be sustained. In the second section of the act incorporating “ the owners and proprietors of the half million acres of land, lying south of Lake Erie,” Swan’s L. L. 106, the management of the affairs of the company is committed to a board of directors, to consist of nine persons, and among other things to be done by said ■directors, it is made their duty to adopt and prosecute measures “ to survey and locate the same,” that is the lands, “ into townships and otherwise, and to make an exact partition thereof, to and among the •owners and proprietors thereof, and their assigns, in proportion to the *176 amount of loss or losses by them respectively owned, at the time of making such partition, in such way and manner as said board of directors shall direct.” In pursuance of this authority, the land was surveyed into townships and quarter townships or sections, the losses were classified, and partition made. In this partition a just proportion of land was set to each right or loss. The proceedings of the company were all recorded in books kept by their clerk, as well in the-transaction of other business as in making partition. By an act of the general assembly of the 20th of February, 1812, Swan’s L. L. 109, it is dii ected that these books of record be kept by the recorder of deeds of Huron county, that they “ be and remain a part and parcel of the records of said county, and that any certified copies therefrom, which-may hereafter be made by the recorder of said county, may be used- and read as legal evidence, in all courts of record, or elsewhere.”
In this'partition, the loss set to James Thompson in the grant of the * state of Connecticut, was classified as belonging to Guy Richards, he claiming as “ assignee” of this interest, in consequence-of the purchase at administrator’s and collector’s sales, and the land in controversy was in part set off to him in satisfaction of this interest. The land having been granted to the heirs of Thompson, and the title-still remaining in them, they may enforce their claim to it, either in/ his hands or in the hands of those who hold under him. In fact •when we remember that this partition was made more than thirty years since ; that it was just and fair ; that lands have been sold and settled with reference to, and in conformity with it; it may be well doubted' whether a court under any circumstances, could be justified in interfering with it.
New trial refused